*54 The judgment of the court (Rost, J. recused himself, being a stockholder in the bank,) was pronounced by
Slidell, J.
The object of this suit is to recover from the States present sum of $12,000 ; and to obtain a further decree adjudging the liability of the State to “contribute as a stockholder, at all times when necessaiy, its proper proportion towards paying the debts of said bank.”
For a proper consideration of the question thus presented, it is necessary to ■ notice somewhat in detail the legislation pertinent to the subject, more particularly the original and amended charter of the corporation, and also such portions of the evidence as have been considered material by counsel.
In 1827, the Consolidated Association of the Planters of Louisiana was incorporated by act of the Legislature.
Its capital was fixed at $2,000,000, to be raised by loan. The subscriptions of the stockholders, who were to be planters exclusively, were to be an amount of $2,500,000, divided into shares of $500 each, and, as the charter expresses, “were intended to secure the loan of two millions.” The association was athorized to raise this capital by issuing a series of bonds payable in five, ten, and fifteen years, with five per cent interest; and to secure the capital and interest of these bonds the subscribers were required to give mortgages on immovable property for the amount of their subscriptions. The subscribers were to be entitled to a credit equal to half the amount of their shares. No dividends were to be made of the profits ; they were to be employed as they accrued, in discounts until the expiration of the charter in 1842; were to remain as a guarantee of the liabilities of the corporation, and not be actually distributed until those liabilities were fully paid. At the end of each year, however, they were to be formally credited in account to each stockholder, in the same manner as if payment were to be made immediately. The administration was to be confided to a board of seven directors, to be elected by the stockholders, and a comptroller was to be appointed biennially by the governor of the State, with powers of inspection, &c.; and whose duty it was made to furnish an annual report to the Legislature. The capital stock of the association was exempted from taxation during its charter, and the charter comprised, besides the usual franchises, the privileges of banking.
The confidence which the founders of this corporation had felt in the practicability of procuring a loan of $2,000,000 by a sale of its bonds, secured by mortgages of the property of its stockholders and their personal obligations as such, proved illusory; and hence, we find them at the ensuing session asking from the State a pledge of its faith to did them in effecting the loan.
This application appears to have encountered a very strong opposition. It was resisted, as appears from a formal protest entered upon the House journal, upon various grounds, and among others as an abuse of the name and credit of the State in favor of individual citizens for objects not of general interest, and under circumstances not assuring the State against ultimate loss. This resistance, however, was ineffectual, and the amendatory act of 1828 was passed.
By the first section of this act the capital, which the company had been authorized to borrow, was raised to $2,500,000 ; and it was also enacted “ that the sum of $2,500,000, divided into shares of $500 each, to be subscribed to guarantee the reimbursement of the loan, shall be, and is, hereby increased to three millions of dollars, subject, however, to the provisions of the act of 1827.” To facilitate the negotiation of the loan of $2,500,000, the faith of the State was, by the 3d section; pledged for the reimbursement of the capital and interest of *55 that sum; and by the 4th section, the Governor was authorized to execute bonds to that amount under the seal of the State. By the 5th section it was enacted “that said bonds may be transferred by the endorsements of the president and cashier of said Consolidation Association, either to the order of any person whatever or to the bearer; and said endorsements shall mention the place where the semi-annual interest on said obligations shall be paid. Then follow two sections, to which the arguments of counsel have been particularly directed, and which it is proper to recite at length.
The 6th section of the charter reads as follows : That the bonds, with privileged mortgage, for the sum of three million dollars subscribed by the stockholders of the said Consolidated Association, in order to guarantee the loan of two million five hundred thousand dollars shall be deposited in the office of said institution for safe keeping, and as a guarantee for the reimbursement of the principal and interest of the bonds given by the State; and, moreover, all the hypothecary obligations, of whatever nature, subscribed by individuals in favor of said Consolidated Association, shall serve as a special guarantee and security for the reimbursement of said capital of two million five hundred thousand dollars, and the interest thereof, and shall, for that purpose, be deposited in the office of said institution, inasmuch as the said Consolidated Association is bound for the reimbursement of said bonds subscribed by the State, at their respective instalments, and to pay the semi-annual interest, until the whole amount of the principal is reimbursed. Section 6th, act of 1828, page 32.
The 7th section is as follows : That the State shall be, and is hereby acknowledged to be a stockholder to the amount of one million of dollars as a bonus (que l’Etat sera reconnu actionnaire pour une somme d’un million de piastres, átitre de bonus,) on condition, however, that the credit granted to the State, in consideration thereof, shall be two hundred and fifty thousand dollars, without defalcation, and during the entire duration of the charter; and that the State shall pay interest on the whole or a part of its credit, as the case may be, whenever it shall make use of the same ; and moreover, the dividend arising from the said one million of dollars stock shall be paid to the State treasurer in the same proportions, and at the same time that the dividends accruing to other stockholders are to be paid.
By the 10th section the governor was authorized to deliver these bonds to the corporation. By subsequent sections the secretary of State and the attorney general were invested with authority to examine the securities offered by stockholders, and to require additional securities if considered necessary, or else a reduction of the number of the stockholder’s shares to an amount for which the security offered by him should be thought a sufficient guarantee. The number of directors was increased to twelve, of whom six were to be appointed by the governor.
Under this charter the corporation was organized, its capital being a fund of $2,500,000, borrowed upon the State bonds. Its list of stockholders, as kept by the corporation, exhibited eight thousand shares, three million as subscribed by individuals, and one million for the State. In July, 1831, a dividend was declared and credited to the different stockholders, as directed by the act of 1827. Subsequent dividends were declared in like manner. They amounted in all to twelve and a half per cent. The dividend account of the State exhibited a credit in its favor of $125,000. The State was apprised of these credits through the annual report of the comptroller. In 1830 an act was passed relative to the corporation, the 8th section of which directed that a payment of four thousand *56 dollars should be made to the secretary of State and attorney general for services rendered, and to be tendered to the corporation; and the 9th, that the corporation should advance that sum, and be reimbursed in principal and interest “out of the monies that shall accrue to the State at the expiration of the charter, in its capacity of stockholder in the sum of one million of dollars.
On the 23d of July, 1842, the directors became satisfied that the losses suffered by the bank for several years previous, had amounted to a sum more than sufficient to absorb the profits which had been carried as dividends to the credit of the accounts of the stockholders; and a resolution was passed to annul those credits, and carry the whole amount of the previously declared dividends, making an aggregate sum of five hundred thousand dollars, to the credit of the profit and loss account. The State’s dividends were annulled in the same manner as those of the individual stockholders.
The subsequent operations of the bank have disclosed the- fact that there will be a loss to the stockholders ; the assets of the bank will bo insufficient to meet its debts, including the bonds issued by the State and the accruing interest thereon; and that a contribution will be required from the stockholders, to meet the deficiency. In contemplation of this state of affairs, a law was passed providing, inter alia, that the managers of the Consolidated Association should be authorized to extend the term of payment of the bonds of the State six, nine, twelve, fifteen, and eighteen years.. ’ They were also authorized to negotiate with the bondholders to procure the release of the State, upon the accomplishment of which, the stockholders were to have the exclusive management of the bank. The duty was enjoined upon its managers of applying specially the proceeds of all property sold to satisfy stock obligations, to the redemption of the bonds of the State issued for its account. It was also made their duty to require such annual or periodical payment from the stockholders, independently of their stock obligations, as would accumulate a fund sufficient to meet faithfully and regularly the obligations of the State for the account of the bank.
In compliance with the provisions of this act, the managers of the bank, after an examination of its affairs, came to the conclusion that a sum of about $500,000, payable in seventeen years by equal instalments without interest, would be required to meet the deficiency, and a resolution was passed in June, 1847, directing six dollars to be paid as a contribution on each share of stock on the 1st June, 1849.
Application was made to the Legislature for an appropriation of $12,000, being the amount of contribution claimed by the bank as due from the State on two thousand shares, at $500 per share, and the governor recommended an appropriation. But the Legislature being divided in opinion as to the liability of the State, an act was passed by which it was enacted “That the Consolidated Association is authorized and empowered to sue the State for the purpose of testing the liability of the State to contribute as a stockholder for losses sustained by said association.”
It will be observed that the clause of the charter in which the State is acknowledged to be a stockholder, and admitted to a participation in the contemplated profits of the company, is qualified by an expression to which, very properly, the argument of counsel have been earnestly directed. The State shall be, and is hereby acknowledged to be a stockholder to the amount of one million of dollars as a bonus.” “L’Etat serareconnu actionnaire pour une somme d’un million de piastre, d litre de bonus.” It is undoubtedly our duty in interpreting a statute, to attribute, if possible, some force and meaning to all its words. ’What *57 then is the meaning of these expressions: “ as a bonus;” “a titre de bonus.” And how far do they qualify or affect the antecedent terms'?
,, A bonus is defined by Bouvier, in his law dictionary, to be a premium paid to a grantor: as the bank pays a bonus to the State for its charter — a consideration given for what is received. We regard it as fairly implying an advantage, a benefit given in return for the benefit received, or an inducement to the grantor for conferring that benefit. It is a matter which pertains to the history of corporations in this country, where they have been so much multiplied, that legislatures have been disposed to take advantage of the avidity of individuals to obtain charters, specially for banking purposes, and have been in the habit of exacting a species of public compensation for the privileges and advantages conferred. Hence the term bonus has become a familiar one, and is associated in its common acceptance with the idea of some advantage, benefit, quid pro quo, stipulated for the public.
That such is the fair import of the term, may be gathered from frequent instances in our own statute book and those of other States. ,
Thus, in the 17th section of the charter of the Louisiana State Bank, the grantor says: “In consideration of the privileges and benefits conferred by this act upon the said bank, the president, directors, and the company thereof, shall pay to this State the sum of one hundred thousand dollars, in the following manner, to wit, ten thousand dollars as soon as the bank shall go into operations, and ten thousand dollars per annum during the nine next succeeding years.”
In the digest of the statutes made under the authority of the legislature, this provision is noted in the margin, by the learned compiler, as the bonus to be paid by the State; and is so termed by the lawgiver himself in a subsequent act amendatory of the same charter. Moreau’s Digest, vol. 1; 75, 78.
In the amendatory charter of the Carrollton Bank, sundry heavy burdens were imposed in consideration of the benefits granted; and, among others, it was obliged to pay to the Male Orphan Asylum of New Orleans, annually, the sum of five hundred dollars during the space of ten years. The foregoing bonus, said the statute, shall be considered a full consideration for any right on the part of the State to tax the company. The Canal Bank, by the stipulation (sec. 26 Acts of 1831, 56,) that at 'the expiration of thirty five years its canal, road, machines &c., shonld be vested in the State, gave a bonus which has perhaps cost that corporation a million of dollars.
The Exchange Bank, (Acts of 1835, 203,) in consideration of the exemption of its capital stock from taxation, agreed to pay into the treasury of the State $40,000.
In short, the statute books abound with these impositions of bonus, some eo nomine, others in an indirect form; some heavier, some lighter, accordingly perhaps, to the prevailing tone of the legislature, or the eagerness of the particular applicants.
It seems to us impossible to reconcile the fair and every day import of this expression with the interpretation claimed by the counsel for the plaintiff. They say it was a privilege, an advantage, a bonus to the State, to be admitted as a stockholder, on the same footing as other stockholders; to share in profits if made; to be liable, like the other stockholders if losses were incurred, to contribute towards those losses. But this cannot be said to meet the idea of a bonus, especially when we consider who were the contracting parties. The State held in its own hand, the power of granting or withholding corporate franchises; *58 Srant“1S or w’tbholding the aid of its faith and credit. The bank was the creature; the State the creator. It seems to involve almost an absurdity in tenns>t0 construe the clause as contended for, if we bring the State and the few citizens who asked the charter, face to face, and suppose the latter saying to the former, give us the privileges and franchises of a corporation, lend us your bonds to the amount of two and a half millions to enable us to borrow money; and as a tonus for your liberality you shall have the privilege of being a stockholder, on an equal footing with us to the amount of one million; sharing our profits if we gain, but sharing our losses if we lose.
We think it has been well said by the counsel for the defendant, that upon the hypothesis of the plaintiff, when carried out to its practical consequences, the State could not in any result that might occur, receive a real tonus. If the money borrowed on the faith of the State for the bank’s capital, should, at the close of her affairs, be found intact to an amount adequate to meet all liabilities, and no more, these individuals and the State would stand on precisely equal footing. Neither would be a dollar out of pocket; neither would have received a dollar of gain. The State in that case could not be said to have received a tonus.
If profits were realized, and a surplus left after discharging all liabilities, the State and the individuals would share it proportionably, and in this equality we find no tonus.
If losses were sustained, and the State is to pay an equal share of those losses, and thus stand upon an equal footing with the individuals with whom it is associated, with what propriety can it be said to have received a tonus from them?
It is, indeed, with much reason asserted on the part of the defence, that according to the plaintiff’s construction, the State, instead of receiving a tonus from the stockholders, has, in reality, given them one for the privilege of engaging in the enterprise on an equal footing with them. It gave them not only the usual corporate privileges and franchises, coupled with banking powers and the exemption from taxation, but assumed, in the issue of its bonds, a responsibility for the entire capital of two and a half millions, while its associates only bound their estates and persons each for his proportion of that capital. Moreover, the State’s right of discount was proportionably but one half of that allowed to individual stockholders.
But, it is said, the construction invoked by the State is at war with a principle which is consecrated by its own express legislation on the subject of partnership. . Counsel cite the articles of our Civil Code, which declare that a participation in the profits of a partnership carries with it a liability to contribute, between the parties, (associés,) to the expenses and losses; and that a stipulation that one of the contracting parties, (associés,) shall participate in the profits of a partnership, but shall not contribute to losses, is void, both as it regards the parties and third persons. If, therefore, the construction of the law be doubtful, a court, it is urged, should eagerly seize upon an interpretation which would enable it to avoid imputing to the State, the desire of malting a contract of a character so disreputable, [it is said,] in the estimation of the wise and just of all ages, and opposed to the equitable spirit of its own enactments controlling contracts between man and man.
This argument rests on too broad an assumption, if it takes for granted that, under the spirit and true meaning of the code, a contract between individuals, that one partner should share the profits and be exempt from the losses, would *59 be void under all circumstances. Equality is the spirit of the rule: and we are not prepared to say that such a stipulation would be void, as between the parties, where the exemption was based upon a fair and just equivalent given to his associate, by the partner in whose favor it was stipulated. It would be against reason to brand such a contract as infamous. With what propriety can it be argued that such a contract offends good morals, where so many juris consults have recognized, not only its reasonableness, but also its legality ? It may be laid down, says Mr. Story, as a general rule of the Common Law, that, in order to constitute a partnership, it is not essential that the partners should equally share the profits and losses. It is sufficient if they are to share in the profits of the business after a deduction of the losses; or, in other words, that they should share in the nett profits according to their respective proportions. It is therefore, he says, competent for the partners, by their stipulations, to agree that the profits shall be divided, and if there be no profits, but a loss, that the loss shall be borne by one or more of the partners exclusively, and that the others shall, inter sese, be exempted therefrom. Story on Partnership, § 23. Mr. Collyer announces the same doctrine. “ It is not, however, neccessary that every party to the contract should undertake to share the loss. A man on entering a partnership may stipulate to be free from all liability to loss; and such stipulation will hold good between himself and his co-contractors. In such case he will still be a partner, enjoying, in addition to the advantages of the partnership, the indemnity afforded him by his companion.” Collyer on Partnership, 9. He cites, in support of the doctrine, the opinion of Vinnius: De damno nihil adjeci, quia lucrum tantum spera.nt spectantque socies; damnum prater votum eorum accidit. Sed nee damni communio ad substantiam societatis pertinet; quippe qua etiam ita constituí potest, ut unus e sociis damni sit expers. Voet, in recognizing the validity of an agreement, ut unus ferat lueri partem, de damno non teneatur, observes: Quo casu postremo licet conventio videatur primá specie tantum lueri non vero damni communionem inducere, contra naturam societatis; non tamen itá est, eo quod isto in casu non aliud in lucro esse intelligitur, quam quod super'est pensato omni damno, ac proinde idem file, qui secundum verborum eortieem á damni onere videri poterat immunis esse, tamen interveniente hác lueri cem damno pensatione damni quoque communionem re ipsa subit. Voet, Com. Ad. Pan. lib. 17, tit. 2, §8. But whatever the proper interpretation of the provisions of our code, the argument deduced from the analogy of a partnership between individuals, fails, if the analogy itself be incomplete. The State, in the present contract, cannot be treated as a simple individual, without overlooking the relation of the contracting parties towards each other when the contract was made. The State, in virtue of its sovereign power, had the right of making the law for the particular case, and of prescribing the terms upon which it would accord its grant; and, in prescribing them, cannot be said, by the most fastidious casuist, to have forced an unconscientious bargain with it own citizens. We are not informed how many planters held the stock originally; but we may fairly assume that their number was not greater than is shown by the present list of stockholders: say one hundred planters, out of the whole population of the State. These individuals had asked, and obtained, from the State, in 1827, a bank charter. Its capital was to be raised upon the personal security of each stockholder, to the amount of his subscription only, backed by a mortgage of his real estate of estimated equivalent value. The project failed; the capital could not be raised — for what reason ? Undoubtedly, because the capitalists, from whose coffers the money was to be borrowed, distrusted; and, therefore, *60 rejected the security. Anxious to promote their own supposed interests, these one hundred citizens ask the State to come to their aid, by pledging its own faith to the amount of two and a half million of dollars. The direct liability of the State was to go forth in the shape of its bonds; and its ultimate protection for this heavy liability was to be a security which the sagacious capitalists had already rejected. Upon whom would the loss fall, if that protection should prove inadequate ? Clearly, upon the citizens of the State at large, through the medium of taxation. There was, then, a risk to be run which put in jeopardy the interests of the mass, for the benefit of a few. There was no injustice, therefore, in stipulating some compensation for the benefit of the mass. A bonus was stipulated accordingly. The State, for the benefit of the public at large, was to share in the profits, and gave a valuable consideration for its exemption from loss. Was the bonus unreasonable and extortionate? If the result is a fair answer to this enquiry, it cannot be so considered. The profits had a temporary existence on the books of the bank and in the imagination of the projectors; but all hope of them is now abandoned, while the bonds of the State, in consideration of which the supposed bonus was given, are still unredeemed. But if we exclude from our minds the grave lessons of a later experience, and endeavor to place ourselves in the position of the lawgivers of that era, it is fair to conclude that the bargain of the State, even in their contemplation, rested upon an expectation, an emptio spei, which even a sanguine statesman, although deeming it highly advantageous, could scarcely have considered as amounting to a certainty, and which, as we have seen, a minority who were wise in advance of their age, believed to be illusory.
Turning from the language of the 7th section of the act of 1828, to other clauses of the charter, we have found little to weaken and much to fortify the conclusion, that the shares wei'e given to the State as a bonus; that those shares should be considered in the nature of shares settled for, and as fixing the proportion of profits which the State was to receive for the public benefit, as a remuneration for the privileges conferred, the assistance rendered, and the risk incurred. In the charter of 1827, the subscription of the stockholders for $2,500,000 and their mortgages “were intended to secure the loan,of two millions of dollars,” the capital of the bank. In the amendatory charter of 1828, the same idea is studiously kept in view. The subscriptions of the individual stockholders to an amount of $3,000,000, are “to guarantee the reimbursement of the loan” of $2,500,000; the mortgages by the stockholders, like their personal obligations, are “to guarantee the loan of $2,500,000.” These subscriptions, these mortgages, and all the hypothecary obligations of whatever nature, subscribed by individuals, are to serve, in the stringent language of the 6th section, as a special guarantee for such reimbursement, and be deposited accordingly. We are unable to understand how the State, as between itself and the individual stockholders, can be considered as having contemplated any other course than that the subscriptions- and mortgages of the individual stockholders, and all the.other assets, should be exhausted before the public treasury, which is supplied by the contributions, and is, therefore, the property of all its citizens, should be resorted to by the bondholders.
We may add, that the defence of the State is also strengthened by a reference to the charters of those corporations in which the State reserved the right of taking stock upon the footing of a stockholder in the ordinary sense. In the charter of the Louisiana State Bank, whose capital was limited to $2,000,000, divided into 20,000 shares, of $100 each, it was provided, “that a sum of *61 $500,000 Shall be reserved to the exclusive use of the State, to be subscribed for by the State treasurer, for the use of the State, which will, immediately after the passage of this act, take .shares for at least $100,000, in order to be en.titled to appoint the six directors ,as mentioned m the subsequent section, and for the balance of said sum at such time as the legislature will deem convenient.” In that case the State, as the other stockholders, was to pay money for its shares. It bargained for its bonus in another form : $10,000 as soon as the bank should go into operation, and $90,0.00 in instalments of $10,000 per annum during the nine succeeding years. Moreaus’s Digest, 69, 75. So in the case of the Gas Bank it was enacted by the 5th section of the charter, that the State treasurer shall be authorized to subscribe for the State, for any number of shares not exceeding, in the whole, the sum of $100,000, for the payment of which the governor and treasurer are authorized to issue one hundred bonds, in the name of the State, each for the sum of $1,000, payable to the order of the president and directors of the said bank. This bank did not escape a bonus; for example, it was bound to furnish at its own expense, within one year, twenty lights for the use and accommodation .of the Charity Hospital. Stats, of 1835, sec. 5, 39, &c., pp. 97, 108.
It is therefore decreed that the judgment of the district court be reversed, and that there be judgment in favor of the defendant, the costs in both courts, to be paid by the plaintiff.